1    CHARLES D. JARRELL (SBN 172108)
cjarrell@allenmatkins.com
2    ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
865 S. Figueroa St., Suite 2800
3    Los Angeles, CA 90017
Telephone: (213) 622-5555
4    Facsimile: (213) 620-8816

5    JOSEPH M. TERRY (*pro hac vice*)
jterry@wc.com
6    MATTHEW D. HEINS (*pro hac vice*)
mheins@wc.com
7    WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
8    Washington, DC 20005
Telephone: (202) 434-5000
9    Facsimile: (202) 434-5029

10    *Attorneys for Plaintiff*

11

12           **UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
13                **WESTERN DIVISION**

| | |
|---|---|
| | Case No.:2:21-cv-02117 |
| | **COMPLAINT** |
| SECRETARIAT ADVISORS LLC, | |
|        Plaintiff, | 1. **DEFAMATION** |
| | 2. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |
|    v. | 3. **VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT** |
| HKA GLOBAL LIMITED and TOBY HUNT, | 4. **VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW** |
|        Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

**COMPLAINT**

1.   Plaintiff Secretariat Advisors LLC ("Secretariat"), by and through its attorneys, and for its Complaint against HKA Global Limited ("HKA") and Toby Hunt ("Hunt"), hereby alleges as follows:

## I.   INTRODUCTION

2.   This lawsuit arises from the unlawful conduct of Toby Hunt, Head of Europe and Chief Business Development Officer for HKA Global Limited ("HKA"), who, on behalf of HKA and in the scope of his duties therefor and as a Partner and a member of HKA's Global Executive Committee, waged a fraudulent misinformation campaign against Secretariat in an effort to destroy its reputation, sabotage its business, and interfere with its contractual relationships and prospective economic advantages.  On information and belief, Hunt and HKA did so with the goal of improving HKA's own competitive position to help its corporate parent, Bridgepoint Advisers, Ltd., as it prepared to sell HKA.

3.   Secretariat is a leading international expert firm providing consulting and advisory services across a variety of industries and business sectors, including as testifying experts in contentious proceedings before courts and arbitral tribunals throughout the world.  Like any expert services firm, Secretariat's business depends on its human resources and relationships, both with its roster of experts and with its clients.  Its leadership accordingly devotes significant time and resources to cultivating those relationships and maintaining Secretariat's excellent reputation as a trustworthy, capable, and reliable source for expert services.

4.   Secretariat's competitors, including and especially Hunt and HKA, are well aware that for an expert services firm, reputation is everything.  Secretariat's reputation as a reliable and trustworthy source for expert analysis and industry knowledge is why it has been able to build a team of top flight experts who have in turn developed relationships with countless clients seeking their counsel, advice, or testimony.  Firms with bad reputations, by contrast, struggle to attract clients and risk losing their most qualified and talented experts to more reputable firms.

5.   Knowing this, Hunt, on behalf of HKA, took aim at Secretariat's reputation by papering the internet with insults, innuendo, and insinuations about Secretariat's integrity.  He

**COMPLAINT**

1 | bombarded the internet with attacks on Secretariat's reputation.  Then he stepped up his efforts with
2 | outright lies.

3 |      6.     This effort culminated in an egregious violation of federal and state law, designed
4 | specifically to impugn Secretariat's reputation and undermine its business relations:  On
5 | July 21, 2020, Hunt logged onto the widely read career website Glassdoor.com and fabricated an
6 | entirely fictional post in which he purported to be a longtime employee of the London office of
7 | Secretariat—rather than the Chief Business Development Officer of one of its principal
8 | competitors—and professed that he was concerned about the "ethics" and "greed" of Secretariat, that
9 | he felt Secretariat's reputation had been deteriorating as a result of a recent judicial decision in the
10 | U.K. courts involving Secretariat, and that he disapproved of its Chief Executive Officer.

11 |      7.     Hunt's statement that a current employee of Secretariat disapproved of its
12 | management, questioned its ethics, worried over its greed, and felt it had "reputation issues" and that
13 | its reputation had taken a "hit" as a result of a recent court case—and that the employee felt strongly
14 | enough about those issues to post about them on Glassdoor—was false, and Hunt knew it.  He knew
15 | it because there was no such employee.  The self-described Secretariat employee was in fact Toby
16 | Hunt, posting under false pretenses.

17 |      8.     Having planted this false public story, Hunt then went about disseminating it and
18 | ensuring it received widespread attention.  Through LinkedIn and other means, Hunt reached out to
19 | people he knew in the industry, as well as *current Secretariat experts and experts Secretariat was in*
20 | *the process of enlisting*, to encourage them to look into the "XYZ case," knowing full well that his
21 | false statement was waiting for them online.  Discovery will also demonstrate that Hunt specifically
22 | directed individuals to the content of the Glassdoor post that he created.

23 |      9.     Having launched this campaign to damage the reputation of Secretariat, Hunt and
24 | HKA then went about trying to profit from it, contacting a headhunter to reach out to Secretariat
25 | employees, including **every single member** of Secretariat's Los Angeles office, in the hopes that
26 | Hunt's lies would have made those employees amenable to jumping ship for HKA.

27 |      10.     Hunt and HKA's motives in doing so are clear.  HKA's owner, Bridgepoint, was
28 | preparing HKA for a sale, by which Hunt and the other HKA partners, and Bridgepoint itself, hoped

1    to profit.  Hunt and HKA believed that this campaign would allow HKA to diminish the fortunes of

2    a principal rival and create the conditions for strengthening HKA's own roster of experts and

3    competitive position with clients at this key time.  In short, Hunt and HKA acted based on the very

4    "greed" and "lack of ethics" of which they richly accused Secretariat.

5           11.    Hunt's gambit paid off.  On information and belief, at least one person who

6    Secretariat had been working to hire ultimately decided not to work for Secretariat as a consequence

7    of this misconduct.  Secretariat has had to expend resources trying to retain its employees and

8    minimize the damage caused by Hunt's lie that Secretariat's employees are dissatisfied, distrusting,

9    and disturbed by Secretariat's "ethics," "greed," and "reputation issues."  And HKA, meanwhile, has

10   reaped the benefits, targeting Secretariat's current employees, prospective experts, and clients.

11          12.    The misconduct by Hunt and HKA constitutes defamation, unfair competition, and

12   intentional interference with prospective business advantage.  It is also a violation of the federal

13   Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  Secretariat therefore brings this suit against

14   Defendants seeking monetary and injunctive relief, to prevent Defendants from further undermining

15   its business and reputation, and to obtain compensatory and punitive damages based on Defendants'

16   unlawful conduct.

17   **II.    PARTIES AND RELATED ENTITIES**

18          13.    Secretariat is a privately held corporation organized and existing under the laws of

19   Delaware.  Its principal place of business is at 1175 Peachtree Street N.E., 100 Colony Square,

20   Suite 400, Atlanta, Georgia, 30361.  Secretariat's California office, which Defendants targeted with

21   their unlawful activity, is located at 2100 E. Grand Ave., Suite 375, El Segundo, California, 90245.

22          14.    HKA Global Limited is a privately held company organized under the laws of the

23   United Kingdom.  Its principal place of business is at 3200 Daresbury Park, Warrington, WA4 4BU,

24   United Kingdom.  It is a subsidiary of Bridgepoint Advisers Limited.  HKA maintains offices in

25   California, including its Los Angeles location at 4605 Lankershim Blvd., Suite 840, North

26   Hollywood, California, 91602; its Granite Bay location at 5935 Granite Lake Dr., Suite 110, Granite

27   Bay, California, 95746; and its San Diego location at 11440 W. Bernardo Court, Suite 120, San

28   Diego, California, 92127.  Each of these locations stood to benefit from HKA's use of defamatory

1  statements and fraudulent acts to sabotage Secretariat's business and poach experts from its Los

2  Angeles office.

3       15.     Toby Hunt is a Partner, the Head of Europe, and the Chief Business Development

4  Officer of HKA.  He is also a member of HKA's Global Executive Committee.  He is a resident,

5  domiciliary, and citizen of the United Kingdom.  He engaged in all wrongdoing detailed herein

6  within the scope of his duties for HKA and for the benefit of HKA and himself as a Partner in HKA.

7       16.     Bridgepoint Advisers Limited is a privately held company organized under the laws

8  of the United Kingdom.  It is a private equity firm.  Its principal place of business is at 12 Wigmore

9  Street, London W1U 1FB, United Kingdom.  It is HKA's parent company and is currently seeking to

10  sell HKA.  HKA employees have described HKA management as being "simply puppets to the PE

11  owners," i.e. Bridgepoint, and have described Bridgepoint as the "tail" that "wags the dog" of HKA.

12  **III.    JURISDICTION AND VENUE**

13       17.     The Court has subject matter jurisdiction over Secretariat's federal Computer Fraud

14  and Abuse Act claims pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over

15  Secretariat's state law claims against Defendants pursuant to 28 U.S.C. § 1367.  The Court also has

16  subject matter jurisdiction over Secretariat's state law claims because no Defendant is a domiciliary

17  of the same state as Secretariat and the amount in controversy exceeds $75,000.  *See* 28 U.S.C.

18  § 1332.

19       18.     The Court has personal jurisdiction over each Defendant because a substantial part of

20  the unlawful conduct in this case took place in or was designed to inflict harm in California.  Hunt,

21  acting on behalf of and within the scope of his duties for HKA, made the false statements at the

22  center of this litigation in California by accessing and fraudulently posting on the website of

23  California company Glassdoor.com, in violation of terms of use that he agreed to and that specified

24  that disputes arising therefrom would be adjudicated in California.  Defendants acted with an intent

25  to cause harm to Secretariat in California not only by undermining Secretariat's business in

26  California and poaching experts from Secretariat's Los Angeles, California office (among other

27  things), but also by diminishing Secretariat's global business at the expense of its California resident

28  shareholders, whose wealth and income is a function of the company's profits.  Indeed, as part of

1    this campaign, HKA, through an agent, directly reached out to and solicited current Secretariat

2    employees located in Los Angeles—a planned raid preceded by Hunt's attempted reputational

3    sabotage of Secretariat.  In short, Defendants' actions were aimed squarely at this forum and

4    foreseeably inflicted harm in this forum, making personal jurisdiction proper in this case.

5       19.    Venue is proper within this District under 28 U.S.C. § 1391(b) and (c) because a

6    substantial part of the events or omissions giving rise to the claims alleged in this Complaint

7    occurred in this judicial district and because Defendants are not residents in the United States.

8    **IV.    FACTUAL ALLEGATIONS**

9      **A.    The *XYZ* Case**

10       20.    Secretariat is a leading international expert firm.  With over 170 employees in offices

11    all over the world, from Australia to the United Kingdom to Hong Kong to Los Angeles, Secretariat

12    is the preeminent resource for clients seeking expert counsel, advice, investigation, or testimony in

13    subject areas like construction delay and damages, government contracts, forensic investigation, and

14    litigation economic damages analysis.

15       21.    Secretariat's largest office is in Atlanta, Georgia, where it was founded several years

16    ago by Don Harvey, the company's current Managing Director and Chief Executive Officer.

17    Secretariat's Los Angeles office includes three Managing Directors—Wayne Kalayjian, Ted Scott,

18    and Michael Kling—and two Associate Directors—Maria Petrov and Carlos Vara.

19       22.    In March 2020, the Technology and Construction Court (TCC) in the United

20    Kingdom granted an injunction in an action titled *A Company v. X, Y, Z*, 2020 EWHC 809 (TCC),[1] a

21    case presenting novel questions about conflicts of interest for global expert services firms arising in

22    an International Chamber of Commerce arbitration.  The injunction was continued by another

23    decision of the TCC on April 3, 2020.  *See A v. X, Y, Z*, 2020 EWHC 809 (TCC).  These judicial

24    decisions referred to the parties by pseudonyms, and the identities of the parties were not publicly

25    revealed at the time of these decisions.

26       23.    Secretariat was the expert firm involved in this case.  However, the parties were

27    subject to a confidentiality order and could not discuss the case publicly during its pendency.  Had

28

---

[1] The names of the companies involved in the TCC case were anonymized per court order.

5

**COMPLAINT**

1  anyone at Secretariat discussed the case publicly while subject to the confidentiality order,

2  Secretariat would have been in breach of the confidentiality order and could have been held in

3  contempt of court.

4     **B.**  **HKA's Campaign to Discredit Secretariat**

5     24.  Almost immediately following the TCC's decisions in early 2020, Hunt began using

6  his LinkedIn account to manufacture concern about Secretariat's role in the *XYZ* case.  Shortly after

7  the TCC's April decision, he posted that "it seems crazy that the expert firm would have taken this

8  position on conflicts."

9     25.  Hunt posted frequently about the case on his LinkedIn account, "liking" posts about

10  the *XYZ* case and advancing implicit criticism about the experts involved in the case.  For example,

11  he repeatedly stressed that the case "did NOT involve HKA," and alluded to it presenting grave

12  concerns about the ethics of the firm involved.  These comments and likes were emblematic of his

13  frequent use of public internet posting, including through his LinkedIn account, in his capacity as an

14  officer of HKA and in an effort to advance HKA's business interests at Secretariat's expense.

15     26.  Hunt persisted in his smear campaign throughout the spring and summer of 2020,

16  attempting to spin the false narrative that the conduct of the firm involved in the *XYZ* case was

17  somehow shameful.  His strategy was to criticize the firm involved in the *XYZ* case while promoting

18  HKA, comparing the other firm's alleged lack of integrity with the supposedly unimpeachable ethics

19  of his own.  In May 2020, for instance, Hunt noted in a LinkedIn post that he had been asked

20  whether HKA was the expert firm involved in the *XYZ* case, and again vigorously stressed that it was

21  not:  "I thought I should post this message to state categorically that HKA were NOT the expert firm

22  involved in this case.  The HKA brand has been built on the highest standards of integrity; we have

23  rigorous internal policies, process and procedures which meet and surpass all of our regulatory

24  obligations and we operate to the highest ethical standards, including those related to our legal,

25  regulatory and fiduciary duties and obligations.  Those of you who are eagle eyed and have read the

26  judgement in full may have spotted at para.56 that the company providing expert services in this

27  case is part of a group owned and controlled by a US entity.  The HKA Group is owned and

28  controlled by a UK entity."

27.    In total, Hunt posted, liked, or commented on LinkedIn posts related to the *XYZ* case at least **57 times**.

28.    Although Hunt wrote this post and other similar posts on his personal LinkedIn page, he did so in his role as HKA's Chief Business Development Officer and Head of Europe, and as a Partner and a Member of HKA's Global Executive Committee.  He intended for experts at Secretariat and elsewhere, as well as clients and prospective clients, to read his posts.

29.    Hunt's work was part and parcel of HKA's corporate strategy to disparage Secretariat.  Others at HKA used this online forum to communicate with current and prospective clients and experts.  Renny Borhan, Chief Executive Officer of HKA, publicly replied, "Our quality, our people and the way we conduct business define our firm – thanks Toby for clarifying this misunderstanding."  Simon Moon, HKA's Chief Operating Officer, also replied, stating, "Well said Toby.  Reputation is everything ……… taking hard effort and integrity of many to build ……….  And ours is precious to all our colleagues in HKA and to our many valued clients."  HKA Director Caryn Fuller echoed this sentiment:  "Passing along an important message stating that HKA was NOT the expert firm involved in the recent decision A Company v XYZ [2020] EWHC 809 (TCC).  We have rigorous internal policies, processes and procedures in place and we always operate to the highest ethical standards.  #HKA #experts #ethicalstandards".  HKA Partner Charles Wilsoncroft publicly replied, "Important message from Toby Hunt setting out that we work to the highest standards of ethics at HKA.  I am proud to work for a company that has such rigorous procedures and practices in place to deal with issues of ethics and, importantly, that we have a culture that aligns with those procedures."  Haroon Niazi, an HKA Partner and Head of Middle East, replied as well, saying, "Thank you for clarifying Toby Hunt – I know this is being widely discussed in the #MiddleEast – particularly as the project in question is in #SaudiArabia – where of course HKA has an excellent track record.  We have also worked on a number of packages on this project but in strict compliance with our conflict procedures and processes and to the highest ethical standards.  #AvB, #NotHKA".

30.    These individuals were acting in their capacity as agents of HKA, using these public online posts to advance a narrative about the supposed integrity and ethics of HKA's business (while

7

**COMPLAINT**

offering contrasting criticism of HKA's competitor) with the expectation that their statements would find an audience of current and prospective clients and experts of HKA.  They believed that by promoting the notion that *XYZ* showed the involved firm's lack of integrity while repeatedly denying their own involvement in the case, they could both (1) advance HKA's reputation for integrity and ethical client treatment, and (2) disparage their competitor, whose identity they hinted at in their disparaging public posts.  That is why they engaged in this public dialogue on behalf of HKA.

31.     This is a typical practice at HKA:  its officers, directors, and partners engage in public conversation on online forums such as LinkedIn with the intent to advertise HKA's business, tout its reputation, and attract experts to join its ranks and clients to enlist its services.

32.     HKA and its agents, including Hunt, do this because they understand that an expert services firm's reputation for integrity is key to its success, and that positive commentary about an expert services firm's reputation and commitment to operating with the highest ethical standards benefits the firm.

33.     Conversely, HKA and its agents, including Hunt, know that *negative* commentary about a firm's reputation and statements that cast doubt on whether the firm operates with the highest ethical standards harm the firm.

34.     HKA—and Hunt specifically—knew that Secretariat was the expert services firm involved in the anonymized *XYZ* action.  On May 2, 2020, Hunt and HKA CEO Renny Borhan reached out to Paul Roberts, Managing Director of Secretariat's Australia operations, hoping to convince Roberts that he should join HKA because the *XYZ* case had dramatically undermined Secretariat's reputation.  Hunt wrote:  "I don't know if the recent A vs. B judgement in the TCC has given you any concerns about the reputation, viability and/or future direction of Secretariat more widely?  Everyone is talking about it in the legal circles as I am sure you are aware . . . .  In any event, if you are minded in any way to consider a return to HKA and want to chat, don't hesitate to let us know."  Hunt was trying to convince Mr. Roberts that he should be concerned about Secretariat's reputation, and that he should act on those concerns by leaving Secretariat for HKA.

35.     Mr. Roberts did not bite.  He responded that the *XYZ* judgment "doesn't give me concerns about Secretariat," and that he was "enjoying my work life at the moment for the first time

1   in a very long time."  He commented as well that it was "unlikely I will consider leaving Secretariat"

2   to do anything but run his own business.

3      36.   Hunt's campaign on behalf of HKA continued throughout the summer of 2020.  On

4   July 17, 2020, he targeted Mike Allen, a Chartered Quantity Surveyor and Managing Director in

5   Secretariat's Hong Kong office, with a message similar to the one Mr. Roberts received:  "I don't

6   know if the recent A vs. XYZ judgement in the TCC has given you any concerns about the

7   reputation and/or future direction of Secretariat, but I thought I might drop you a note to see if you

8   are interested in engaging with us here at HKA about possible opportunities?"  Yet again, Hunt was

9   trying to convince a Secretariat expert that he should be concerned about Secretariat's reputation and

10  that he should respond by leaving Secretariat for HKA.

11     37.   Like Mr. Roberts, Mr. Allen was unmoved by Hunt's insinuation that he should be

12  worried about Secretariat's standing.  He responded on July 18, 2020, telling Hunt that he was "very

13  happy" at Secretariat and that he was not interested in engaging in dialogue about moving to HKA.

14     38.   When Mr. Allen rejected Hunt's overture on July 18, 2020, it became clear to Hunt

15  and HKA that Hunt expressing his opinions about the *XYZ* decision would not alone be enough to

16  damage Secretariat or undermine the confidence of its employees.  That is why only ***three days*** later,

17  having failed to injure Secretariat with rumors and innuendo, Hunt and HKA embarked on a new

18  tactic:  outright lies.

19     **C.    Hunt's Defamatory Statements on Glassdoor**

20     39.   On July 21, 2020, Hunt accessed the website Glassdoor.com with the intent of

21  publishing false and defamatory statements about Secretariat.

22     40.   Glassdoor is a California company that owns and manages a company ratings

23  website.  The Glassdoor website is a forum for current and former employees to review companies

24  anonymously.  When a company's current or former employee posts a review of the company, that

25  review is publicly available to any person seeking information about the company online.

26     41.   Glassdoor reviews allow current and former employees to provide a "Headline" for

27  their review.  They may also list "Pros" and "Cons" of the company and offer "Advice" about the

28  company.  They may give a numerical "Overall Rating" of the company and a "CEO Rating,"

9

**COMPLAINT**

1   through which they may provide a numerical rating and identify the person they are rating by name.

2   They may also provide information about themselves, including whether they are a current or former

3   employee, whether they are planning to change jobs, where they are located, whether they are full-

4   or part-time, and the length of their employment.

5         42.   Current and former employees of Secretariat have used Glassdoor to review

6   Secretariat on a number of occasions, and have given the company uniformly favorable reviews.  In

7   nineteen reviews currently posted on Glassdoor, Secretariat has an average Overall Rating of 4.8 out

8   of 5, and 100% of reviewers have given CEO Don Harvey a CEO Rating of "Approve."  No current

9   or former Secretariat employee has ever used Glassdoor to profess any concerns with the company's

10  reputation for integrity, questioned its ethics, or disparaged its leadership.

11        43.   At 5:28 AM PDT on July 21, 2020, Hunt logged into Glassdoor from the IP Address

12  86.173.154.224, from his hometown in England, using the email address hunttv@icloud.com, and he

13  posted a review for Secretariat.

14        44.   Hunt's name was not included on his review, and he did not provide Glassdoor true

15  information about his identity.  The email address hunttv@icloud.com, however, belongs to Hunt,

16  and the IP address used to post the review belongs to a device in Hunt's home.

17        45.   In his review, Hunt claimed he was a "Current Employee" of Secretariat in "London,

18  England (UK)," and that the length of his employment at Secretariat was "3-4 years."  This was a lie.

19  Hunt is not currently, and has never been, a Secretariat employee.  In truth, he was a senior executive

20  for a principal competitor seeking to divert experts and business from Secretariat.

21        46.   Hunt falsely stated that as a current employee of Secretariat, he had concerns about

22  its conduct as well as its reputation as a result of the *XYZ* case.  Specifically, posing as a current

23  employee of Secretariat, Hunt provided the following headline for his review of Secretariat:  "Good

24  but reputation issues following recent case."  In the "Pros" and "Cons" sections of his deceptive

25  review, he stated that Secretariat's "Cons," from a current employee's perspective, included that

26  "The recent A vs XYZ case has hit our reputation in the industry with clients and lawyers – have we

27  been too greedy?"

28

47.     Hunt also falsely stated that a current employee of Secretariat had doubts about whether Secretariat was sufficiently ethical.  Specifically, posing as an employee of Secretariat, Hunt answered the "Advice" prompt in his Glassdoor review by stating:  "Reputation is everything – are we ethical in our approach at all times?"

48.     Hunt also gave Secretariat's CEO and Managing Director in Atlanta, Don Harvey, a "2.0 – Employee 'Disapprove'" rating.  Hunt made this statement—that a Secretariat employee "disapproved" of the company's Managing Director—knowing full well that it was false.  After all, the employee who purportedly disapproved of Mr. Harvey *did not exist*, and was merely a figment of Hunt's imagination.  This CEO Rating was concocted by Hunt to further HKA's business aims and disparage Secretariat.  It also bears noting that Mr. Harvey himself has a busy practice as a consulting and testifying expert, such that a disgruntled employee's public negative statements about him would be expected to undermine not only the organization he leads, but also his individual reputation and ability to attract assignments personally.[2]

49.     In so doing, Hunt, on behalf of HKA, published false statements and defamatory statements of fact regarding Secretariat:  that an established employee of Secretariat's London office had concerns about whether Secretariat was being too "greedy" and about its ethics, that employee knew that Secretariat's reputation among lawyers and experts had been diminished as a result of the *XYZ* case, and that that employee "[d]isapprove[d]" of Secretariat's leadership and viewed it poorly.

50.     These were not mere statements of opinion.  These were false statements of fact— that an employee who had worked for three to five years at the London office actually held these highly negative views regarding Secretariat and its leadership, and knew that the reputation of Secretariat had been diminished.  And because Hunt had falsely reported these as being the views of

---

[2] Hunt peppered his review with modestly positive comments that would give his deception an air of realism, and likely to avoid tarnishing the professional reputations of some of the experts he sought to poach while skewering Secretariat itself and its management.  He listed as a "Pro" of Secretariat that it had "Some very good global experts who share knowledge," and he answered "Yes" when asked whether he would recommend the job to a friend.  Hunt did this to lend credence to his false representation that he was an employee of Secretariat.

an actual veteran employee of Secretariat, they implied to the reader that they were based on undisclosed facts that would be known only to a Secretariat employee.

51.     This statement was especially egregious because at least one of the employees Hunt had attempted to lure to HKA, in response to an inquiry about whether the *XYZ* case concerned him, had *expressly told* Hunt that as a current employee of Secretariat he *did not* have any concerns about Secretariat or its high ethical standards.  Unsatisfied with the answer he received, Hunt invented a contradictory one he preferred and then spread it as gospel.

52.     HKA's efforts to disparage Secretariat in HKA's own name were seen for what they were, a smear campaign by a commercial competitor.  So Hunt, on behalf of HKA, decided to invent a corroborating inside source—a Secretariat employee with insider knowledge who expressed the same concerns and criticism leveled by Hunt and HKA and who would lend factual credence to HKA's smears.

53.     Hunt's publication of these fabricated statements was false and defamatory.  It also violated the Terms of Use of Glassdoor.

54.     The utility of Glassdoor depends upon the shared understanding and premise that the postings it contains are truthful accounts from real employees, whether currently or formerly employed by the organization being reviewed.  Glassdoor's Terms of Use Section 3, "Using Glassdoor," Subsection B, "House Rules," provides as follows:

You agree that you will not:

- **Impersonate another person**, or his or her email address, or **misrepresent your current or former affiliation with an employer**;

- **Create user accounts under false or fraudulent pretenses**; . . .

- Violate these terms, the terms of your agreements with us, explicit restrictions set forth in our Community Guidelines, or any applicable law, rule or regulation;

- **Post Content that is defamatory, libelous, or fraudulent; that you know to be false or misleading; or that does not reflect your honest opinion and experience**; . . . .

*See* Glassdoor Terms of Use Section 3.B (emphases added).

12
**COMPLAINT**

55.     Hunt's post violated several of these terms:   He impersonated a Secretariat employee and/or misrepresented that he had a current affiliation with Secretariat; he created his user account under false or fraudulent pretenses; and he posted content that was defamatory, libelous, or fraudulent, that he knew to be false or misleading, and that did not honestly reflect his experience.

56.     Glassdoor users are also required to follow its Community Guidelines, which mandate that reviews be "truthful and constitute your own personal opinion and experience with your current or former employer."  Glassdoor advises its users that it "expect[s] you to stand behind your statements expressed in your content."  By pretending to be a Secretariat employee and posting a negative review of the company, Hunt violated these Community Guidelines.

57.     Hunt's statement was public, and was intended to be seen by Secretariat's current and prospective experts and clients in California and elsewhere.  He posted it to a widely used company information website that consumers in California, throughout the United States, and elsewhere frequently use to evaluate whether they would like to do business with a company, whether as a partner, a client, or an employee.  Hunt knew and intended that his false statement would reach a wide audience, and would create the misimpression that a Secretariat employee had reacted to the *XYZ* case by posting to Glassdoor that he disapproved of Secretariat's leadership and was concerned that Secretariat was unethical, greedy, and had a bad reputation.

58.     Hunt's malicious actions to fabricate negative employee statements about Secretariat were likely also motivated by the long string of adverse employee reviews on the internet regarding HKA, describing "egotistical managers/partners" who "have no interest or concern for the wishes or needs of their staff"; noting that HKA "tr[ies] to act like a major player . . . but . . . fail[s]"; describing it as "a micromanaged sweatshop," with "Senior Management, who only seek sales and more sales"; a place where "no one enjoys working" and "[t]here is a real lack of respect for colleagues."

59.     Subsequent to Hunt's fabricated negative Glassdoor entry regarding Secretariat, and as HKA was being prepped for sale to the highest bidder, HKA's Glassdoor reviews began to rise significantly.  That too was likely the result of fraudulent postings by Hunt or others at HKA.  On information and belief, Hunt and HKA have engaged in this campaign because they know that an

1   expert services firm's online profile, including and especially on Glassdoor, significantly impacts its

2   value.  Such evidence will provide even more proof that HKA and Hunt acted with both common

3   law and actual malice.

4          **D.     HKA Capitalizes on Hunt's Lies**

5          60.     The conduct of Hunt and HKA in the weeks and months that followed demonstrated

6   that the fraudulent Glassdoor post was part of a coordinated effort to harm Secretariat and bolster

7   HKA's competitive position in advance of its sale.

8          61.     During that period, Hunt made a concerted effort to ensure that his post would reach

9   its intended audience:  Secretariat's current and potential partners, clients, and employees.  On

10  information and belief, Hunt reached out to individuals in the industry to direct them to the

11  Glassdoor post.  He did not disclose that he was the person who had written it and that its contents

12  were complete fiction.

13         62.     Hunt also worked more subtly to communicate his false statements to Secretariat's

14  current and prospective clients and employees.  He continued to post to LinkedIn prolifically about

15  the *XYZ* case—sometimes several times a day—linking articles about the case, reposting others'

16  commentary, and opining that Secretariat deserved criticism for its conduct.  Hunt was using his

17  LinkedIn account the same way he had used it throughout the summer of 2020:  as a means of

18  reaching current and potential clients and employees (including Secretariat's current and potential

19  clients and employees) on HKA's behalf.

20         63.     Linking to articles and commentary on the case, Hunt's aim was to create enough

21  doubt in the mind of his audience about Secretariat's integrity and reputation that they would go

22  looking for more information online.  He knew that if Secretariat's current or prospective clients or

23  employees were to do that, they likely would discover Hunt's fraudulent Glassdoor post, which

24  would cause harm to Secretariat and its business.  In this respect, Hunt's fraudulent Glassdoor post

25  was contrived (1) to create a basis for calling into question Secretariat's integrity and reputation, and

26  (2) to serve as a vehicle to disseminate this fabricated concern to others.  Combined with naked

27  statements of self-promotion and avowals of a different, more ethical approach at HKA, Hunt's acts

28  sought to benefit HKA directly, to the detriment of Secretariat.

64.     HKA also commenced an aggressive campaign to lure Secretariat's current employees away from Secretariat.  In August 2020—a few short weeks after Hunt posted the fraudulent Glassdoor review—HKA retained a recruiter who began contacting *every member of Secretariat's Los Angeles office*.  HKA employees, including Adam Winegard (Los Angeles) and Tracy Doyle (Philadelphia)—both of whom report directly to Hunt as members of his Business Development team—began monitoring the LinkedIn profiles of Secretariat's Los Angeles team.  In September 2020, Winegard reached out directly to Ted Scott, a Managing Director in Secretariat's Los Angeles office, to ask him about the *XYZ* decision and attempt to recruit him to HKA.

65.     Hunt aided this concerted effort with his unlawful conduct.  He planted phony evidence that a Secretariat employee was disenchanted with Secretariat, disapproved of its leadership, and doubted its commitment to high ethical standards; then he and HKA worked to encourage Secretariat's Los Angeles team—and, on information and belief, others in other Secretariat locations—to reconsider their business relationships with Secretariat.

66.     Though HKA has long been on notice of Hunt's wrongdoing, as of the date of filing, Hunt remains listed on HKA's website as HKA's Chief Business Development Officer, as a member of HKA's Executive Committee, and as HKA's Head of Europe.

**E.     Defendants' Wrongful Conduct Significantly Harmed Secretariat**

67.     HKA's misconduct had real consequences on Secretariat's business.  Hunt's defamatory statement lived online and was available to anyone seeking information about Secretariat on the internet *for months*, during which time Hunt relentlessly encouraged people to scour the internet for more information about Secretariat and the *XYZ* case, and HKA staff and retained recruiters worked tirelessly to reach Secretariat's staff and experts to convince them to evaluate their employment options.  HKA, meanwhile, actively endorsed Hunt's actions.  Indeed, he remains on HKA's Global Executive Committee today.

68.     By posing as a Secretariat employee and discussing the *XYZ* case publicly, Hunt also knowingly placed Secretariat at risk of being held in contempt of court.  Throughout 2020 and up until January 2021, including when Hunt posted to Glassdoor, Secretariat was subject to a TCC confidentiality order that prohibited the company from discussing the case publicly.  Hunt was well

1  aware that the *XYZ* case was anonymized and subject to a confidentiality order, and by purporting to

2  be a Secretariat employee publicly commenting on the case in violation of that order, he deliberately

3  placed Secretariat in the TCC's crosshairs.

4        69.     The negative impact of Hunt's and HKA's campaign on Secretariat's reputation was

5  felt in its current and prospective relationships with employees, as well as its current and prospective

6  relationships with clients and business partners.  For example, in late January 2021, Secretariat

7  extended a job offer to an individual it had been recruiting to join its Los Angeles office.  The recruit

8  accepted Secretariat's offer, but then, only three days later, abruptly rescinded his acceptance.  This

9  recruit had a longstanding mentorship relationship with a Managing Director in Secretariat's Los

10  Angeles office, and the company had previously been confident that he would join its ranks to work

11  with his mentor.  He gave no explanation for his last-minute decision.  The most plausible

12  explanation for his abrupt about-face is the obvious one:  that he saw or was shown Hunt's false

13  Glassdoor post and became nervous that Secretariat's employees did not have faith in the company.

14        70.     This lost employment relationship was undoubtedly not the only one.  The full extent

15  of Secretariat's damages as a consequence of HKA's misconduct is unknown, and will be adduced

16  through discovery.

17            **FIRST CAUSE OF ACTION**

18            **Defamation (under California law)**

19            **(against all defendants)**

20        71.     Secretariat incorporates all of the above paragraphs as though fully set forth herein.

21        72.     Like any expert services firm, Secretariat's business depends on its reputation and its

22  relationships, both with its experts and with its clients.  Its leadership accordingly devotes significant

23  time and resources to cultivating those relationships and maintaining Secretariat's excellent

24  reputation as a trustworthy, capable, and reliable source for expert services.

25        73.     On July 21, 2020, Defendant Hunt, acting on his own behalf and on behalf of

26  Defendant HKA, published a false statement that a Secretariat employee had posted an online review

27  of Secretariat stating that "[t]he recent A vs XYZ case has hit our reputation in the industry with

28  clients and lawyers" and that the company had "reputation issues following recent case," that the

employee "[d]isapprove[d]" of the company's leadership, and that the employee wondered whether Secretariat had "been too greedy?" and was "ethical in our approach at all times?".

74.    These were false statements of fact in that the post stated that an employee of Secretariat not only possessed such information and held such views, but held them so firmly that she or he had chosen to post publicly on Glassdoor to warn others about those concerns.  Moreover, because Hunt's post falsely stated that a veteran employee had made these statements, it falsely conveyed that they were based on undisclosed facts that would be known to such an employee.

75.    Hunt and HKA knew and intended that these statements would harm Secretariat in its business and its reputation more generally.

76.    Hunt's statements constituted defamation per se.

77.    Hunt made these statements with both actual and common law malice.  He knew the statements were false because he invented them from whole cloth.  There was no such employee and no employee had made the statement about Secretariat.  Hunt did this, on behalf of HKA and within the scope of his duties, for the purpose of harming Secretariat and allowing HKA (and himself) to reap the benefits of that harm.

78.    As a direct and proximate result of Hunt's defamatory statements, Secretariat has sustained and will continue to sustain significant injuries and damages, including to its reputation and its prospective and current business relationships, in an amount to be proven at trial.

79.    HKA and Hunt caused these damages through acts of malice and fraud.

80.    Secretariat has been damaged by all of the foregoing and is entitled to an award of general and special damages.  It is also entitled to an award of punitive damages, as well as any other damages, fees, and costs as are just and proper.

## SECOND CAUSE OF ACTION

### Intentional Interference with Prospective Economic Advantage

### (against all defendants)

81.    Secretariat incorporates all of the above paragraphs as though fully set forth herein.

82.    Defendants knowingly interfered with Secretariat's relationships with its current and prospective clients and employees.  Hunt's false and defamatory statement that a Secretariat

1  employee had information that the reputation of Secretariat had declined, had information that

2  caused that employee to question Secretariat's greed and lack of ethics, disapproved of management,

3  and was concerned enough to publish a disparaging company review on Glassdoor, was used in

4  Defendants' campaign to undermine Secretariat's relationships with its business partners, including

5  its employees and prospective employees.

6       83.    HKA used Hunt's false statements as part of its long-term effort to lure Secretariat

7  staff in the Los Angeles office away from Secretariat.  This campaign included the use of a recruiter

8  to solicit every member of Secretariat's Los Angeles office, as well as direct recruitment calls from

9  HKA's Los Angeles staff to Secretariat's suggesting that Secretariat's employees abandon the

10  company and asking them to consider whether their view of the company was affected by the *XYZ*

11  decision.  On information and belief, one goal of these efforts was for Secretariat's employees to

12  discover Hunt's defamatory statements on Glassdoor and believe them to be true.

13       84.    As a direct and proximate result of Defendants' misconduct, Secretariat was injured

14  and suffered damages.  This includes, but is not limited to, the loss in September 2020 of at least one

15  of Secretariat's prospective business relationships with a potential new hire who accepted an

16  employment offer from Secretariat before abruptly reversing course without explanation.  On

17  information and belief, this individual's decision to revoke his acceptance was caused directly and

18  proximately by Defendants' misconduct, when the individual saw or was shown Hunt's false

19  statements.

20       85.    Secretariat has been damaged by all of the foregoing and is entitled to an award of

21  compensatory damages, as well as any other damages, fees, and costs as are just and proper.

22                        **THIRD CAUSE OF ACTION**

23          **Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030**

24                       **(against all defendants)**

25       86.    Secretariat incorporates all of the above paragraphs as though fully set forth herein.

26       87.    Hunt, on his own behalf and on behalf of HKA, created a fake Glassdoor account so

27  that he could pose as a Secretariat employee and denigrate Secretariat through a company review on

28  the Glassdoor website.

88. Hunt is not a current or former employee of Secretariat. Yet he nevertheless logged into Glassdoor and posed as a "Current Employee" of Secretariat, whereupon he made false and disparaging comments regarding Secretariat.

89. Hunt posted this to the Glassdoor website without or in excess of authorization, in plain violation of Glassdoor's Terms of Use, which he agreed to when he posted on the website and which provide as follows:

You agree that you will not:

- **Impersonate another person**, or his or her email address, or **misrepresent your current or former affiliation with an employer**;

- **Create user accounts under false or fraudulent pretenses**; . . .

- Violate these terms, the terms of your agreements with us, explicit restrictions set forth in our Community Guidelines, or any applicable law, rule or regulation;

- **Post Content that is defamatory, libelous, or fraudulent; that you know to be false or misleading; or that does not reflect your honest opinion and experience**; . . . .

*See* Glassdoor Terms of Use Section 3.B (emphases added).

90. Defendants benefited from this unauthorized computer access: they used this unlawful publication in furtherance of their relentless campaign to improve their own reputation at the expense of Secretariat's, and they relied on it to develop their business by attempting to pilfer Secretariat's clients and employees.

91. As a direct and proximate result of Defendants' misconduct, Secretariat suffered damage and loss exceeding $5,000. This includes, without limitation, the damages Secretariat suffered as a consequence of lost employee and client relationships and the money Secretariat was forced to spend to rehabilitate its reputation and repair its relationships after Defendants spread the lie that a Secretariat employee was speaking out about his mistrust and disapproval of the company and its greed and lack of ethics, along with the losses and costs associated with investigating the fraudulent Glassdoor post.

92.     Secretariat has been damaged by all of the foregoing and is entitled to an award of compensatory damages, as well as any other damages, fees, and costs as are just and proper.

**FOURTH CAUSE OF ACTION**

**Violation of the California Unfair Competition Law, Cal. Bus. & Profs. Code § 17200**

**(against all defendants)**

93.     Secretariat incorporates all of the above paragraphs as though fully set forth herein.

94.     Hunt and HKA engaged in unlawful, unfair, and fraudulent business acts and practices.  Such wrongful conduct includes, without limitation, the use of false and defamatory statements made in violation of California law, the Computer Fraud and Abuse Act, and the agreed Glassdoor Terms of Use, as set forth above.

95.     Defendants' acts were proscribed by law.  Hunt's statements were false and violated California's law against defamation.  Using the statements in a campaign to pillage Secretariat and siphon off its clients and personnel violated California's law against intentional interference with prospective economic advantage.  Accessing Glassdoor under false pretenses to inflict harm on Secretariat was a violation of the federal Computer Fraud and Abuse Act.

96.     Defendants' acts were unfair and deceptive for all of these reasons, and for the additional reason that by posing as a Secretariat employee and dishonestly posting misinformation to Glassdoor, Hunt (on HKA's behalf) violated the website's Terms of Use in an effort to harm HKA's competitor.

97.     Competition is not unlawful.  But California law prohibits companies from engaging in fraudulent and deceitful business practices.

98.     This wrongful conduct constitutes Defendants' business practice, as the false and misleading statements Hunt made on Glassdoor were made in connection with his effort, on behalf of HKA, to improve HKA's business and sabotage the business of its direct competitor.

99.     As a direct and proximate result of Defendants' fraudulent, unfair, unlawful, and deceptive business practices, Secretariat was injured and suffered damages, including through the loss of a potential employee in Secretariat's Los Angeles office after HKA's Los Angeles staff engaged in a concerted effort to poach Secretariat's California personnel.  Defendants' misconduct

1   affected Secretariat generally and globally, but a substantial amount of the wrongful conduct giving

2   rise to this cause of action occurred in California, where HKA targeted Secretariat's operations and

3   caused Secretariat harm.

4      100. Secretariat has been injured and has lost money as a result of this misconduct.  It has

5   sustained injury to its reputation—the lifeblood of an expert services firm, as Defendants well

6   know—and, on information and belief, it has lost active and prospective clients, business partners,

7   and employees as a direct and proximate cause of Defendants' misconduct.  Secretariat is entitled to

8   damages and restitution for its losses.

9      101. Secretariat has suffered harm and will continue to suffer harm without court

10   intervention.  It is entitled to injunctive relief and all other relief that the Court finds equitable and

11   just.

12              **PRAYER FOR RELIEF**

13      WHEREFORE, Secretariat respectfully requests the following relief:

14      102. Judgment in Secretariat's favor and against Defendants on all causes of action

15   alleged herein;

16      103. For general and special damages in an amount to be further proven at trial;

17      104. For preliminary and permanent injunctive relief;

18      105. For exemplary or punitive damages;

19      106. For restitution;

20      107. For costs of suit incurred herein;

21      108. For prejudgment interest;

22      109. For attorneys' fees and costs; and

23      110. For such other and further relief as the Court may deem to be just and proper.

24

25

26

27

28

21

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Secretariat hereby demands trial by jury for all causes of action, claims, or issues in this action that are triable as a matter of right to a jury.

DATED:  March 8, 2021                                     Respectfully submitted,


By: /s/ Charles D. Jarrell
Charles D. Jarrell (SBN 172108)
cjarrell@allenmatkins.com
ALLEN MATKINS LECK GAMBLE MALLORY &
NATSIS LLP
865 S. Figueroa St., Suite 2800
Los Angeles, CA 90017
Telephone: (213) 622-5555
Facsimile: (213) 620-8816


WILLIAMS & CONNOLLY LLP
Joseph M. Terry (*pro hac vice* forthcoming)
Matthew D. Heins (*pro hac vice* forthcoming)
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
jterry@wc.com
mheins@wc.com

*Attorneys for Secretariat Advisors LLC*

**COMPLAINT**

1

## **CERTIFICATE OF SERVICE**

2        The undersigned hereby certifies that a true and correct copy of the foregoing document has

3  been served on March 8, 2021 to all counsel of record who are deemed to have consented to

4  electronic service via the Court's CM/ECF system.

5

6  Dated:  March 8, 2021               /s/ Charles D. Jarrell

7                                        Charles D. Jarrell

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28